Donald K. Birner (admission *pro hac vice sought*)
Attorney at Law (0213152)
d.birner@comcast.net
2613 Mayflower Dr.
Pekin, IL 61554
(309) 925-3037

Kaiser U. Kahn (SBN 139929 )
Law Offices of Kaiser U. Kahn
kaiser.khan@sbcglobal.net
1388 Sutter Street Suite 910
San Francisco, CA 94102

Attorneys for named Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD E. POTTER, and PHILLIP NOVAK, individually and on behalf of all others similarly situated, | Case No. 17-cv- |
| | Class Action Complaint and Jury Demand |
| Plaintiffs, | |
| v. | |
| CHEVRON PRODUCTS COMPANY, a division of Chevron U.S.A. Inc. d/b/a Havoline Xpress Lube | |
| Defendants. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiffs, Donald Potter and Phillip Novak (together Plaintiffs), bring this Class Action Complaint and Demand for Jury Trial (Complaint) against Defendants, Chevron Products Company a division of Chevron U.S.A, d/b/a Havoline Xpress Lube, (together as "Chevron"), based upon the deceptive and unfair practices relative to, add on charges in connection with its oil change services.  Plaintiffs allege as follows, upon their personal knowledge as to themselves, and as to all other matters, upon information and belief, including investigation conducted by their attorneys.

1

## PRELIMINARY STATEMENT

### Nationwide Practice

1.      This putative nationwide class action consists of thousands of persons, that defendant Chevron repeatedly charged bogus oil recycling/disposal fees and/or shop supply fees at its Havoline Xpress Lube [HXL] Centers ("Centers"), throughout the country immediately after their vehicles' oil and filters were changed.  This wrongful practice resulted in overcharging each  customer for their oil change.  This practice continues.

### Illicit Add on Oil Recycling and Shop Supply Fees

2.      For many years, Chevron by and through its Centers engaged in improper oil change practices requiring plaintiffs and other class members to pay fees associated with  recycling or disposing used oil generically entitled environmental fees or environmental service fees or hazardous waste disposal fees or similar designation ["recycling or disposal fees"], as well as shop supply fees, at its Centers. Customers were not advised of the true nature of these charges.

3.      Defendants' recycling or disposal fee purports to be a legitimate governmental and/or regulatory charge when, in fact, either there was no such lawful regulatory charge or at least not equal to the amount invoiced.

4.      Alternatively, if there is any such governmental charge, the recycling or disposal fee charged by defendants bear no correlation or reasonable relationship to any legitimate governmental charge.

5.      In fact, oil destined to be recycled according to the Petroleum Institute of America is not considered to be hazard waste by the federal government or 48 states and the used oil and used oil filter generated from an oil change is frequently sold, often at a profit, to oil recyclers for refinement and resale for various uses

6.      These Centers also charge customers  fictitious 'shop supply' fees, by labeling charges as unspecified 'shop supplies' the consumer is purposefully not

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1    informed of the supplies purportedly provided and is therefore denied the

2    information necessary to judge whether or not the charge is justified.

3        7.    Indeed, there are no shop supplies consumed during the typical oil

4    change, nor were any such supplies provided to any of the class members.  In

5    reality, so called supply items are items used in the business (for example rags or

6    tools) that constitute  overhead expense— as distinguished from items sold to the

7    consumer, such as filters and oil.

8                    **Bogus Fees Implemented By Centers**
       **Operators With the Knowledge and Consent of Chevron Utilizing Standard**
9                    **Invoices Required by Chevron**

10        8.    Both the oil recycling or disposal fees and shop supply fees were

11    charged with the knowledge, consent and active participation of Chevron. The

12    Operators were at all times required to print and issue to customers an invoice

13    identical to that depicted in the Guide. which features the HXL-Chevron logo in the

14    upper left hand corner of the invoice. See§ 8 ¶ 2 of Ex. 2.  In addition, Chevron

15    regularly published coupons, that specifically reference and attempt to legitimize

16    these deceptive charges, for use by participating Centers across the country.  *See*

17    *HXL-Chevron logo below required on invoices and exemplar of coupons issued*

18    *by HXL-Chevron as a part of its nationwide marketing campaign.*



25    HXL-Chevron trademark in upper left corner of required invoice.



9.    These Centers operate under the daily guidance and control of Chevron d/b/a Havoline Xpress Lube ("Chevron") as mandated by the *Standard Sales Program Agreement* between these Operators and Chevron, attached as *Exhibit 2*, as well as a comprehensive '*Guide to Operators' Exhibit 3* both contracts formed in the State of California. ["Contracts"]

10.   The word mark "Havoline Xpress Lube Chevron" along with its mark drawing is a trademark wholly owned by Chevron, which was prominently displayed

4

on the exterior and interior of these Centers, as provided for by the Contracts. See trademark below.  Specifically, an unobstructed view of the  HXL Chevron trade mark was required by the "Guide to Operators" to be affixed to the lobby door, front and side walls of the building exterior and on an interior menu of services and prices, all as required by the *Guide to Operators*, *Exhibit 3.*

11.     The purpose or reason for the recycling and shop supply fees were not provided to the customers, nor was the method of calculating the fees disclosed to its customers at the point-of-sale or at any time before or after the oil change.  The sole motive behind both fees, was to enhance profits, disadvantage honest competitors and conceal the true nature of the charges.

12.     The whole scheme and artifice practiced by Chevron was to charge phony add-on fees to its customers, thereby increasing the profits made by the Operators, who were better able to purchase contractually required Havoline branded products.  The Operators's policy and practices of charging (all with the knowledge and consent of Chevron) illicit fees dramatically increased each Centers' profits on a nationwide scale by cheating numerous individual consumers, who compose this putative class.

13.     Defendants and their affiliated entities or Operators, under common management control, conspired and acted in concert with one another to impose the charges asserted herein. Defendants are jointly and severally liable along with their affiliated Centers for these fees charged to their customers.

5

14.    The combined terms and substance of these Contracts provided Chevron with daily control over virtually every nuance of the oil change enterprise at each Center, including such standards as: exterior and interior signage bearing the Chevron/HXL brand, logo and trademarks, and specified menu boards; paint, materials and furniture; building exterior and interior; driveway and grounds appearance, specifications and operations; service bay operations; method of driving into the service bays; employee standards; Chevron approved uniforms; echo system of communication; cash out procedures; costumer consultations; handling



6

complaints; customer retention; various checklists.  All of which were compulsory.[1]
See *Standards Checklist pgs 31-33 of Guide Exhibit 3*.

15.    The operational systems and signage required by Chevron led their oil change customers to reasonably believe that the Centers were owned and operated by Chevron.



Required exterior signage

16.    Notably absent from the Contracts is any requirement that the individual Operators post any sign or notice stating the service center is owned or operated by an individual or entity separate from Chevron.  Rather the Guide, *Exhibit 3*, requires extensive exterior and interior signage that exclusively highlights the HXL Chevron name and logo as illustrated above.

---

[1] "This guide describes and illustrates the appearance and service standards required of every authorized Havoline Xpress Lube facility. These standards are important to the success of each Havoline Xpress Lube facility because they meet the expectations of current and potential customers. Strictly enforced, they are the guidelines that enhance overall brand value, making every Havoline xpress lube facility more successful." [ pg 1 of guide]

17.     The contracts between the Operators and Chevron were artfully but disingenuously drafted with the intent and design to give free rein to the Operators to levy false charges against their customers while seeking to hold Chevron harmless, all the while knowing — that absent a class action such as this one — the individual Operators were unlikely to suffer from $4.00 lawsuits spread countrywide. Contracts — *Exhibits 2 & 3*. Indeed, any reasonable interpretation of the salient provisions of these Contracts leads a reasonable consumer to the inescapable conclusion that the Operators are apparent and in fact agents of HXL-Chevron.

### Charging Add on Oil Recycling and Shop Supply Fees a Known Unfair and Deceptive Practice Within the Lube Industry

18.     It is generally known, within the lube industry, that recycling and shop fees are unfair and deceptive. For instance, in a recent settlement with New York Attorney General's Office, Eric Schniderman Kost Tires Distributors stipulated to $270,000 in penalties for charging its customers a phony $2.00 recycling or disposal fee with each oil change. In court documents, Kost admitted it charged its' customers the bogus charges over a two year period, which directly violated New York's Environmental Conservation Law (ECL) §23-2307. Defendant further admitted that the so called oil and filter recycling or disposal fee misled consumers into believing there was a *separate mandatary* charge associated with recycling oil and filters for their vehicles, when if fact there was no mandatory charge, all in violation of the Executive Law §63(12) and New York's General Business Law (GBL) §349. See *Exhibit 4 attached.*

19.     Over a decade ago, lube industry leader Jiffy Lube Inc. [JLI] stated by way of affidavit that: (1) JLI company owned stores do not charge customers "shop fees" or include any such charge on customers invoices; (2) JLI has never suggested to franchisees to charge shop fees (3) In April 2004, JLI's company owned

1  stores ceased charging an environmental surcharge.  [¶11, 13 & 20 respectively of
2  *Exhibit 5* ]

3      20.    Unlike defendant in this case, Walmart, a competitor of HXL and
4  probably the largest retailer of oil change services in this country, does not charge
5  consumers for sham 'oil recycling or disposal fees' or 'shop fees' nor does Valvoline
6  Instant Oil Change Centers, which has over 1,000 shops nationwide.

7                    **A CLASS ACTION IS THE APPROPRIATE REMEDY**

8      21.    Rather than having an unmanageable number of plaintiffs
9  unrealistically filing $4.00 lawsuits, this class action empowers the individual
10  consumer to contest the deplorable conduct of the mammoth corporate foe equipped
11  with unlimited resources. And if plaintiffs prevail, this corporation will longer be
12  able to lift $4.00 from countless vulnerable consumers pockets.

13                                        **PARTIES**

14      22.    Plaintiff, Donald E. Potter is a natural person and citizen in the State
15  of Illinois.

16      23.    Plaintiff, Phillip M. Novak is a natural person and citizen of the State
17  of Illinois.

18      24.    Defendant, Chevron Products Company, d/b/a Havoline Xpress Lube
19  ("Chevron") is a corporation existing under the laws of the State of Pennsylvania
20  with its headquarters and principal place of business  located at 6001 Bollinger
21  Canyon Road, San Ramon, California.

22      25.    Defendant Chevron Products Company, a division of Chevron U.S.A
23  does  business throughout the United States and the state of California, including
24  this District.

25                            **JURISDICTION AND VENUE**

26      26.    Plaintiffs incorporate the foregoing allegations as if fully set forth
27  herein.

28      27.    This court has jurisdiction over this action pursuant to 28 U.S.C

9

§1332 (d)(2), because (i) at least one member of the class is a citizen of a different state than defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs and (iii) none of the exceptions under that subsection apply to this action.

28.    This court has personal jurisdiction over defendant because it conducts business in this District, is headquartered and registered to do business in this District and the unlawful conduct alleged in the complaint occurred, was directed to, and/or emanated from this District at Defendants' California headquarters.

29.    Venue is proper in this District under 28 U.S.C. §1391(b) because defendant resides in this District. The events underlying this action occurred here.

30.    The contracts entered into between the Operators and Chevron namely *Exhibit 2 Havoline Xpress Lube Sales Program Agreement ("Agreement")* and *Exhibit 3 Havoline's Standard of Appearance and Guide to Operators ("standards" or Guide )*  were entered into in the State of California in this District and provides that "the courts in the state of California, USA, shall have exclusive jurisdiction to entertain actions relating to this agreement or the making thereof". . . *Exhibit 2*  ¶29 of Agreement.

31.    The bogus add on fees charged named plaintiffs and putative class members were permitted, authorized, encouraged, enabled and emanated from  the terms and conditions of these Contracts . In fact, these Contracts gave Chevron the power and control to prohibit such billing practices, however, Chevron chose not to prohibit such charges, but rather allowed, aided and abetted such charges to take place throughout the U.S.A., as well as the State of California from its headquarters in Ramon, Ca.

32.    The invoice used by the Operators to charge putative class members disputed fees was mandated by the dual Contracts formed in San Ramon, California, between the various Operators and Chevron. Agreement §8 ¶2 (invoice to

1  be printed to be identical to that depicted in the guide which invoice includes
2  Chevron and HXL names and logos in upper left hand corner of the invoice.)  True
3  to form this standard invoice was given to both named Plaintiffs at Potter and
4  Novak at the point of sale.

5      33.    The unlawful conduct that forms the basis of plaintiffs' claims (i.e
6  deceptive or unfair add on charges that induced consumer transactions) were
7  enabled by the terms of these contracts entered into in the State of California and
8  justifies the application of California law to resolve these claims.

9      34.    Chevron's computers in San Ramon, California on a daily basis
10  captured all sales and consumer charges occurring nationwide at the point of sale
11  at its Centers.  The deceptive fee practices alleged herein were known, reviewed
12  and otherwise controlled, encouraged, aided or abetted or emanated from
13  Defendants' headquarters in San Ramon, California.

14      35.    Moreover, scores of putative class members, who at all relevant times
15  were residents of the State of California, were charged and injured by  add on fees,
16  which form the basis of this action.

17                    **Intradistrict Assignment**

18      Civil L.R. 3-2 (a) provides that all civil actions that arise...in Contra Costa
19  County be assigned to the San Francisco or Oakland Division. This action arose in
20  said county where defendant's corporate headquarters is located.

21                    **COMMON ALLEGATIONS**

22                **The Substance of the Contracts Between**
  **Chevron and its Operators Afforded Chevron Complete Control Over Daily**
23                    **Business Activities**

24      36.    Plaintiffs reallege and incorporate the foregoing allegations as if set
25  forth herein.

26      37.    Although, the pertinent contract are innocuously titled as a "program
27  agreement" and a "guide" endeavoring to insulate Chevron from any  liability
28  arising from the acts of its Operators and further contains self serving boilerplate

                                11

clauses, which claim the Operators are independent contractors and were at liberty to set their own prices — the actual substance and terms of the contract are tailored to afford Chevron complete control and dominion over day to day conduct of the operations, yet ostensibly empower the Operators to charge consumer class members, without limitation, spurious and unjust oil recycling/disposal fees and shop supply fees for example:

### Operator's Retail Automation System was Required to Be Interface with Chevron's System

(a)     The standard written agreement entered into between Chevron and its shops requires each shop to install, at its own expense, a retail automation system (RAS) acceptable to Chevron and is required to *be interfaced with Chevron's system*. In addition, the agreement provides that Chevron has the right to access the RAS capturing all of the sales and charges by each store on a daily basis. Consequently, Chevron has and had complete and total access, knowledge and control over all sales, revenue and fees charged by HXL Operators. See *Exhibit 2 to sales agreement par. 1*

(b)     The binding guide requires the operator to acknowledge that "any deviation from the standards of appearance and operations (the guide) will be considered a material breach of this agreement and grounds for termination of the agreement." *Exhibit 2  §2*

### Operator's Non-Compliance with Quality Image Clause Grounds for Termination

(c)     Further, the agreement between Chevron and its Operators require Operators to acknowledge that "Chevron has developed and maintained a quality image in conjunction with the operation of Xpress Lube facilities and to uphold its standards. " ("Quality image clause") *§3  Program agreement*. Since Chevron has knowledge of all daily transactions, and by virtue of the agreement, has the right to enforce standards with termination as a sanction for non-compliance with its "quality image,"  Chevron has and at all times had, the

1  opportunity to control and monitor day to day charges and shield consumers from

2  illegal charges to protect its 'quality image', yet purposefully chose not to do so.

3          (d)     Certainly the Centers that routinely charge its customers for

4  fictional recycling and shop supply fees are not consistent with anyone's conception

5  of a quality image.  And since Chevron reserved the power to enforce such high

6  standards, it should have prohibited these fabricated charges presented under false

7  pretenses rather then aiding and abetting such false charges with its nationwide

8  marketing and promotions efforts.[2]

9  **60 Item Checklist and Impromptu Inspections  gives Chevron Control Over
   All Aspects of Centers Operations**

10

11          (e)     The 60-item checklist published in San Ramon, Ca  is

12  mandatory and covers every conceivable aspect of the operations. *Exhibit 3, the*

13  *Guide at pgs 31-33*.

14          (f)     The agreement provides that Chevron sets the price according

15  to its schedule for each item purchased by the Operators.  This necessarily affects

16  the price the Operators must charge for their services to their customers.  See

17  Exhibit 2 Agreement §5 ¶1.

18          (g)     The standard agreement required that 100% of all bulk and

19  drum motor oil purchased by the Operators must be Havoline and Chevron branded

20  products.  Agreement §4 ¶2.

21          (h)     In addition, by the terms of the standard written sales

22  agreement, Chevron reserved the right at any time to enter the facilities, without

23  notice, to exercise Chevron's rights under the RAS. Consequently, by virtue of the

24  RAS and impromptu visits to the facilities exercising its rights under the RAS,

25  Chevron, at all times had access to all sales and charges used on a daily basis, as

26

27  [2]Indeed HXL sales agreement ¶ 13(b) provides: "Customer recognizes that it is in
   the interest of the parties to this Agreement for Customer to affirmatively conduct

28  its business to reflect favorably on the parties and *to further promote public
   acceptance of Chevron's products and its identification*." ( emphasis supplied.)

well as any other information maintained in computer by each shop. Exhibit 2 to
sales agreement Par. 5(a) Agreement §8, ¶3.

   (i)     Chevron reserved the right to settle consumer complaints
directly without the intervention by the Operators.

### HXL-Chevron Signage Exclusively Displayed at Centers

   (j)     Only Chevron signs and logos may be displayed in the building
exterior and interior in order to promote public acceptance of Chevron. In fact, the
HXL Sale program agreement paragraph 13 provides: *"Customer will be in breach
of this Agreement if Customer (Operator) does not display the required
identification of Chevron."*

   (k)     The guide required Operators to post exclusively Havoline
Xpress Lube/Chevron signs in the building exterior and interior leading a
reasonable person to believe that station was exclusively owned and operated by
Chevron.

   (l)     Conspicuous by its absence is the lack of any requirement that
the Operators post any notice that they are independent Operators or contractors

### Standard Invoice Prominently Bearing HX-Chevron trademark required

   (m)     The Operators were required to use a standard invoice
mandated by Chevron that included the name and logo of Havoline Xpress Lube and
Chevron in the upper left hand corner of the invoice, which gave the customer the
impression that they were dealing directly with Chevron.

   (n)     As a part of joint marketing plan, Chevron disseminates
coupons to potential customers bearing the Chevron trademark and Logo, which
mentioned hazardous waste and shop supply fees. *Exhibit 1*

   (o)     Operators were required to buy and resell Havoline and
Chevron branded products almost exclusive.

   38.     These express and implied actions or manifestations of Chevron would
lead a reasonable third party or person, such as its customers, to believe the

14

1  Operators has authority to act on behalf of Chevron.  Chevron is liable for the

2  actions of its Operators in the course of operating Chevron's lube centers across the

3  nation.

4      39.    The oil recycling or disposal fees and shop supply fees charged

5  customers are profit enhancers unlawfully obtained by defendants at the expense of

6  its customers and constituted a breach of contract.  All customers who were

7  charged and paid these fees were monetarily damaged in the amount of the add on

8  fees paid by customers for which Chevron is responsible for restitution.

9      40.    Each HXL outlet, including the outlet visited by the named plaintiffs

10  has uniform extensive exterior and interior signage that brands the business as

11  being owned and operated by defendants HXL and Chevron.

12      41.    The required Chevron branded signage, coupled by the lack of any

13  sign or notice stating that the facility is independently owned and operated, the sole

14  use of Havoline branded products and other actions or manifestations mentioned

15  above and in the attached sales agreement and 'Guide' led the consumer to

16  reasonably believe that the Center were being operated by Chevron.  The thrust of

17  the Agreement and Guide was to promote public acceptance of the Chevron and its

18  Havoline branded products at its Centers.

19      42.    Chevron, pursuant to the terms of standard contracts with its

20  Operators, exercised a high degree of control over its Operators' day to day

21  practices and activities and had the means and reserved the right to curtail any

22  deceptive or unfair acts or practices.  Chevron clothed its Operators expressly or

23  impliedly with actual and apparent authority to act as agents of Chevron regarding

24  business practices that included rogue charges such as 'recycling and disposal fees'

25  as well as shop supply fees.

26      43.    These add-on charges allow Chevron and its dealers to advertise a

27  base price lower than the competition while obtaining the same revenue or more.

28

44.     Although these charges are relatively small,  $3-$5 on each occasion and not of the magnitude for any one consumer to file suit, the return to Chevron and its dealers is huge.  Plaintiffs are informed and believe that conservatively Chevron has approximately 300 locations in 33 states which are open an average of 307 days a year and service at least 30 cars a day.

45.     Chevron, at the expense of its customers is unjustly enriched by the assessment of these fee and is obligated and class members are entitled to restitution.

## FACTS SPECIFIC TO THE NAMED PLAINTIFFS

46.     Plaintiffs reallege and incorporate the foregoing allegations as if set forth herein.

### Plaintiff Donald E. Potter

47.     On June 16, 2017, Donald E. Potter had the oil and filter changed on his 2011 Nissan Rogue at the Havoline Xpress Lube located at 8717 Ogden Ave, Lyons, Illinois.

48.     After the oil and filter were changed, he was presented with a standard invoice with the Havoline Xpress Lube-Chevron logo and trademark in the upper left hand corner, that itemizes charges for a hazardous waste disposal fee of $4.14, which unbeknownst to Plaintiff Potter was unlawful.  unfair or deceptive.  He would have objected to paying the fees if advised of their nature and demanded a refund.

1

2

3    He paid the full amount of the above invoice which includes a phony HAZ.

4

5

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1  WASTE DISPOSAL fee of $4.14 also attached as *Exhibit 6*

2  **Plaintiff Phillip Novak**

3  49.    On September 28, 2017, Plaintiff Philip Novak had his oil and filter

4  changed at the Havoline Xpress Lube #159 located at 5409, E. State Street,

5  Rockford, Illinois.

6  50.    After the oil and filter were changed, he was presented with a

7  standard invoice with the Havoline Xpress Lube-Chevron logo and trademark in the

8  upper left hand corner that itemizes  a charge for shop supplies in the

9  amount of  $2.99, which unbeknownst to Plaintiff Novak, was unlawful, unfair or

10  deceptive. He would have objected to paying the fees if advised of their nature and

11  demanded a refund.

12  He paid the full amount of the above invoice which includes a phony shop

13  supply fee of $2.99 see below and also attached as *Exhibit 7*.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

51.     The tolling doctrine applies to cases of concealment like this one. Plaintiffs did not discover and could not discover through the exercise of due diligence that Chevron conspired to charge Plaintiffs' fabricated shop and environmental/hazardous waste disposal fees which had no basis in fact.  Plaintiffs relied upon Chevron's expertise and knowledge. Otherwise, it is reasonable to infer that the consumer, if he or she knew the charges were invalid, would not have paid such fees.  On the other hand, Chevron knew the charges were illegal and provided no benefit to the consumer.

52.     Any statute of limitations otherwise applicable to any claims asserted herein have been tolled by the discovery rule.

### Fraudulent Concealment

53.     All applicable statutes of limitations have also been tolled by Chevron's active and ongoing fraudulent concealment of the facts alleged herein. Defendant knew that the add-on fees should not have been charged class members, but chose not to prohibit its dealers from charging them.  Any otherwise applicable statutes of limitations have, therefore, been tolled by Chevron's active concealment of the facts alleged.

### Estoppel

54.     Defendants, Chevron and Havoline Xpress Lube, are under continuous duty to disclose to plaintiffs and class members the character and nature of their services but instead actively concealed the fact that these charges were fabricated. Plaintiffs and class members reasonably relied upon Chevron's representations that the charges were legitimate.

1

## CLASS DEFINITION

2      55.    All adult persons who were charged and paid a fee purportedly

3  associated with recycling or disposing of used oil and/or for shop supplies, in

4  connection with an oil change performed by Havoline Xpress Lube at any time

5  within the United States.  Excluded from the class are defendants, including any

6  entities in which defendants have a controlling interest, as well as their agents,

7  representatives, officers, directors, employees, trustees, parents, children, heirs,

8  assigns and successors, and other persons or entities related to or affiliated with

9  defendants; and the judges to this case as assigned, their staff, and their immediate

10  families. Plaintiffs reserve the right to amend the class definition.

11

## CLASS REPRESENTATIONS ALLEGATIONS

12      56.    Plaintiffs reallege and incorporate the foregoing allegations as if set

13  forth herein.

14      57.    Certification of plaintiffs claims for class wide treatment is

15  appropriate. Plaintiffs can prove the elements of their claims on a class wide basis

16  using the same evidence that would be used for actions alleging the same claims.

17  This action has been brought, may be proper and may be properly maintained on

18  behalf of the class proposed herein under FRCP 23 satisfying the commonality,

19  typicality, adequacy, predominance, representation and superiority requirements of

20  its provisions.

21

### Numerosity and Ascertainability

22      58.    The members of the class are so numerous and geographically

23  dispersed that individual joinder is impractical. There are no less than 10,000

24  members in this nationwide class. The precise number of nationwide class members

25  may be ascertained from Chevron's and/or HXL books and RAM computer records.

26  Defendants have comprehensive lists of class vehicle owners and the vehicles that

27  had their oil changed in their possession. As reflected in the Havoline Xpress Lube

28  invoices, class members are readily identifiable.  Defendants' computer files have

1  comprehensive lists of class members names and addresses, as well as the make,

2  model and identification number of their vehicle.

3      59.    The identity of the customers who were charged shop supply and oil

4  recycling  fees are in the possession of Chevron and HXL.

5      60.    Accordingly, the disposition of the claims of class members in a single

6  action will provide substantial benefits to all parties and to the court. Class

7  members may be readily notified by recognized, court-approved notice

8  dissemination methods, which may include U.S. mail, electronic mail, internet

9  postings, comment and/or published notice.

10                        **Typicality**

11     61.    The claims of the representative plaintiffs are typical of the claims of

12 the other class members and that the representative plaintiffs, like all class

13 members, had their oil and filter changed at an HXL Center.  The representative

14 plaintiffs, like all class members, have been damaged by defendants.  The

15 representative plaintiffs, like all class members, have been injured by the same

16 conduct or course of action by defendants — sham charges for used oil recycling

17 and/or shop supplies .  The factual basis of defendants misconduct is common to all

18 class and represent a common thread of misconduct resulting in injury to all class

19 members. The class representatives possess the same legal interest and have

20 endured the same legal injury as other class members.

21                   **Adequate Representation**

22     62.    Plaintiffs are members of the nationwide class and will fairly and

23 adequately represent and protect the interest of the class. Plaintiffs have retained

24 counsel with considerable experience in consumer class actions. Plaintiffs and their

25 counsel are committed to vigorously prosecuting this action on behalf of the class

26 and have the financial resources to do so. Neither plaintiffs, nor their counsel, have

27 interests adverse or antagonistic to the class.

28

**Predominance of Common Questions Relate to Plaintiffs Claims**

63.    Federal courts have held that common questions of fact predominate when the defendant acts toward the class members in a similar or common way such as the case here by charging add on fees.  The resolution of the common question of whether Chevron engaged in the common course of conduct and business practice that resulted in it overcharging representatives Potter and Novak and the putative class members is in violation of California law.

64.    The claim requires generalized, class wide proof and is based upon the same legal theory  i.e. overcharging its customers by assessing a oil recycling/disposal fee or shop fees resulting in claims for breach of contract, unjust enrichment and consumer fraud.  Damages flowing from the claim are the same for each class member.

**Superiority**

65.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the class members.  Similar or identical statutory and common law violations and deceptive practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

66.    The damages sustained by the class members  flow, in each instance, from a common nucleus of operative facts —defendant's misconduct of marketing and charging illegitimate fees to class members. A class action where individual damages are minimal is the only means that will provide class members with a viable remedy and such small individual claims are not enough to justify the expenses of separate litigation.

67.    Class  treatment in this court, as a court with original jurisdiction over the class claims will conserve the resources of the courts and the litigants, and will promote consistency and efficiency and adjudication by providing common

1    answers to the common questions of knowledge, conduct, duty and breach that

2    predominate in this action.

3                   **This Action is Brought Under Rule 23(b)(3)**

4        68.     This action is brought under Rule 23(b)(3) primarily because the relief

5    sought per individual member of the class is small given the burden and expense of

6    individual prosecution of potentially extensive litigation necessitated by the conduct

7    of defendants. Hence, individual class members are unlikely to have any interest in

8    controlling the prosecution of their claims. There are no anticipated difficulties

9    likely to be encountered in the management of the claim on behalf of the class.

10       69.     This class action is manageable because of the large number of

11   potential class members basing their claims on the same common course of conduct

12   by Chevron, emanating from its headquarters in this district. A class action is a

13   more manageable and more efficient use of judicial resources than individual

14   claims.

15       70.     It would be virtually impossible for the class members to seek redress

16   on an individual basis and even if some class members themselves could afford such

17   individual litigation, the court system could not.

18                            **CHOICE OF LAW**

19       71.     California law applies because a substantial part of the alleged bad

20   faith, misleading, deceptive, unfair, and unlawful acts and practices were

21   implemented, facilitated, encouraged, authorized and emanated from Defendant's

22   corporate headquarters located in this District at San Ramon, California adversely

23   affecting the named plaintiffs and other class members nationwide, including

24   California residents all of whom paid the phony add on oil recycling and shop supply

25   fees.  In addition, material and relevant contracts— between Chevron and its

26   operatives— implementing, enabling and authorizing the bad faith, deceptive,

27   unfair, and unlawful conduct were formed in the State of California within this

28

District at Defendant's corporate headquarters. (Ex. 2 & 3) These contracts mandated that California law applied to all matters pertaining to these contracts.

## CLAIMS FOR RELIEF

### COUNT I:
### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT BY CHEVRON

72.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

73.    Defendants, through its agents, offered class members an oil and filter change for a sum certain and in some cases, as low as $18.99. Class members accepted the offer or other lump sum offers, which did not include the add on charges, and proceeded to have their oil and filter changed.

74.    Prior to presenting the invoice to its customers, defendant, Chevron, was responsible for setting or permitting a price structure that included add on oil recycling or disposal fees and shop supply fees, thereby increasing the cost of the oil change and thereby breaching the terms of the oral or implied in fact contract.

75.    Defendant, Chevron, was responsible for the imposition of these add on fees, when it set, approved, permitted or ratified the fee schedule for the Centers, which included oil recycling or disposal fees and/or shop supply fees.

76.    As a result of these breaches, class members were damaged by the amount of these erroneous and unjustified add on fees.

77.    Chevron breached the contracts entered into by class members with Chevron's operatives damaging class members in amounts equal to the false charges.

### COUNT II:
### SECOND CAUSE OF ACTION
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

78.    Plaintiffs reallege and incorporate by reference the allegations set forth in the proceeding paragraphs is though alleged in this Count.

79.    Plaintiffs and class members bring this claim in the alternative to their breach of contract claim.

80.    A covenant of good faith and fair dealing is implied in every contract.

81.    Where a contract vests one party with discretion, but provides no standard for the exercise discretion, the duty of good faith and fair dealing applies and the party exercising discretion must do so in a commercially reasonable manner that satisfies the objectively reasonable expectation of the other party.

82.    Based upon defendant, Chevron's representation regarding the prices of the oil change and filter was objectively reasonable for plaintiffs and class members to expect that defendant, Chevron, by setting or approving the prices, would not have permitted the inclusion of illicit oil recycling fees or shop supply fees, which had no relationship whatsoever to the service performed by Chevron's Operators.  There exists no objectively reasonable reason on the part of class members to expect that defendants would have inserted in their standardized invoices charges that were fictitious.

83.    Chevron abused any discretion they had in setting, approving, ratifying, or enabling oil recycling or disposal fees or shop supply fees, which had no relationship to the service performed.

84.    Plaintiffs and class members perform all required duties and all conditions required for defendants to accomplish oil and filter change, without the added fees.

85.    As a result of  Defendants breach of the implied covenant of good faith and fair dealing, plaintiffs in the class are entitled to damages in the amount of the payment made by prospective class members for oil recycling or disposal fees and shop supply fees.

**COUNT III:**
**THIRD CAUSE OF ACTION**
**UNCONSCIONABILITY**

86.     Plaintiffs reallege and incorporate by reference the allegations set forth in the proceeding paragraphs is though alleged in this Count.

87.     Defendants practice of offering low price of oil and filter changes while unilaterally adding contrived charges such as oil recycling or disposal fees and shop supply fees, which had no relationship to the oil and filter changes.

88.     Defendants practices in the hope of charging for services unrelated to the oil and filter change is unreasonably favorable to defendants, Chevron and HXL and unduly harsh and is, therefore, substantively unconscionable.

89.     The levy of such unreasonable and fabricated charges have harmed plaintiffs and class members and have caused them to suffer damages and the amount of the add on fees charged by defendants.

**COUNT IV:**
**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

90.     Plaintiffs reallege and incorporate by reference every allegation set forth in the proceeding paragraphs as though alleged this Count.

91.     Plaintiffs class members bring this claim in the alternative to their breach of contract, breach of the covenant of good faith, and fair dealing claims.

92.     Defendants knowingly retained a benefit at the expense of class members for services not rendered and supplies not delivered to the consumer or by overcharging its customers by adding on a recycling and/or shop supply fees.

93.     Plaintiffs and class members damages are traceable to and resulted directly and proximately from conduct alleged in this complaint.

94.     Under principles of equity and good conscience, defendant should not be permitted to retain monies belonging to Plaintiffs and class members it unjustly received as a result of its unlawful and deceptive conduct described herein.

95.     Plaintiffs and the class had no adequate remedy at law.

26

96.     Wherefore, Plaintiff and class members seek disgorgement of and/or a constructive trust disgorging all profits, benefits and other compensation by defendants retained from plaintiffs and class members through this inequitable conduct.

### COUNT V:
### FIFTH CAUSE OF ACTION
### NEGLIGENCE

97.     Plaintiffs reallege and incorporate by reference every allegation set forth in the proceeding paragraphs as though alleged in this Count.

98.     Plaintiffs and class members bring this claim in the alternative to their breach of contract, breach of the covenant of good faith, fair dealing claims, and unjust enrichment claims.

99.     Chevron devised and dictated to its dealers a standard form to be used as an invoice for charging class members who had their oil and filter changed at HXL shops.  Each of the dealerships had signage, both exterior and interior, that exhibited Chevron's name and trademarks identifying the Centers as being operated by Chevron and HXL.

100.     Chevron required its HXL Centers to install a retail automation system and interface it with Chevron's system. This RAS along with impromptu inspections endowed Chevron with the authority and capability of auditing and monitoring all sales, charges, and take appropriate corrective measures to ensure consumers were properly charged for services rendered by HXL and cease unlawful charges.

101.     Chevron knew or should have known that HXL shops were billing its customers for made-up charges.

102.     Chevron, under these circumstances, had a duty to consumer class members to prohibit false charges by HXL or by Chevron.

103.     Chevron was guilty of negligently failing to control and monitor false costs it knew HXL Centers were charging its customers, when it had the

opportunity and ability to do so. Chevron was further guilty of negligently facilitating or failing to prohibit oil recycling and shop supply fees.

104.    As a direct and proximate result of the aforesaid negligence of Chevron, class members sustained damages in the amount of the payment for false charges and should be reimbursed therefore.

**COUNT VI:**
**SIXTH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**(Business. & Professional Code §§17200 et seq.)**

105.    Plaintiffs reallege and incorporate the foregoing allegations as if set forth herein.

106.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertisements."

107.    Chevron's conduct, as described herein, was and is in violation of the UCL.

108.    Chevron's conduct, as described herein, was and is in violation of the UCL in at least the following ways:

(a)    Chevron's acts and practices of aiding and abetting it's Operators to repeatedly charge its customers oil recycling and/or shop supply fees, constitutes unfair or deceptive acts and practices, and is injurious to consumer class members;

(b)    Defendants material misrepresentations or omissions that oil recycling and shop supply fees were lawful, when they were not, is unfair and deceptive. These deceptive acts or practices were designed so that class members relied upon it and were damaged by payment of the invalid fees;

(c)    Charging these fees separately obscures the true nature of the charge and makes it appear as though the fee is a dedicated charge that is required by law, and that the fees cannot be negotiated by any customer, which was false;

(d)    Advertising prices that appear lower than they actually are (because the fee is not plainly disclosed up front) is an unfair practice for consumers and competitors in that it distorts

28

competition in the marketplace by preventing consumers from accurately comparing the costs of the oil change, thus causing consumers to needlessly incur unnecessary costs;

(e) The recycling and shop supply fees unfairly allow for an increase in the advertised price that occurs after the customer class members accepted the advertised price;

(f) Naming the add-on charge a "fee" is misleading;

(g) Adding such fees after the customers agree to pay a price that does not include a fee;

(h) Adding the fee after services are already performed;

(i) Representing that the shop supply is reasonably related to the cost of certain supplies when, in fact, it is not;

(j) Failing to inform consumers that the shop fees are not directly and proportionally related to the cost of supplies involved in their transaction but rather designed to increase defendant's profit;

(k) the shop supply fees are tacked-on to the advertised or agreed upon price;

(l) These omissions of material information regarding the true nature of  recycling and shop supply fees at issue, constitute unfair or deceptive practices;

(m) The misrepresentation of the both fees is an unfair or deceptive practice;

(n) Plaintiff and Class have suffered ascertainable loss due to the unfair and deceptive practices described in this Count; and

(o) The conduct of defendants was malicious, corrupt, and intentional and/or reckless to a degree sufficient to support an award of punitive damages against defendants.

109.    As a direct and proximate result of defendants material misrepresentations and non-disclosures. Plaintiffs and the class have been irreparably harmed and have suffered losses.

110.    On behalf of the class, plaintiffs seek an order enjoining defendants engaging in such unfair, deceptive, or unconscionable practices. Plaintiffs also seek damages, including but not limited to, awarding the full amount of money that plaintiffs in class members paid as a result of these fees imposed. Plaintiffs also seek an award of attorney's fees and costs.

29

111.    The acts, practices, misrepresentations and omissions by defendants described above, and defendants dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

112.    Defendant's acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or damaged plaintiffs and members of the class in connection with the sale or advertisement of the cheap oil changes. Defendant's conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

113.    Plaintiffs, on behalf of themselves and the class members, seek monetary damages, treble damages and such other and further relief as set forth in each of the above-enumerated statutes.

114.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Chevron under Cal. Bus. Prof. §17200.

115.    Plaintiffs request that this court enter such orders or judgments as maybe necessary to enjoin Chevron from continuing its unfair, unlawful, and/or deceptive practices and to restore to plaintiff and members of the class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §17203 and Cal. Civ. Code §3345; and for such other relief set forth below.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

# PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the class members request that the court enter an order or judgment against defendants, including the following:

A.      Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of plaintiffs as class representatives and their counsel of record as class counsel;

B.      Damages in the amount of monies paid fees;

C.      Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

D.      Pre-judgment and post-judgment interest on such monetary relief;

E.      The costs of bringing this suit, including reasonable attorneys' fees;

F.      An award of reasonable attorney fees and costs to be paid out of the common fund for the above;

G.      All other relief to which plaintiffs and members of the class may be entitled at law or in equity; and

H.      Chevron should be enjoined from charging add on fees.

# JURY DEMAND

Plaintiffs hereby DEMAND TRIAL BY JURY on their own behalf and on behalf of class members.

DATED: November 20th 2017

Respectfully submitted,


/S/ _____
        Donald K. Birner
        One of Plaintiffs attorneys

Donald K. Birner
(admission sought *pro hac vice*)
Attorney at Law (0213152)
Law Office of Donald K. Birner
d.birner@comcast.net
2613 Mayflower Dr.
Pekin, IL 61554
309-642-1589
Fax: 309-925-5838

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

32