United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DONALD POTTER, et al.,

        Plaintiffs,

    v.

CHEVRON PRODUCTS CO.,

        Defendant.

Case No. 17-cv-06689-PJH

**ORDER**

Re: Dkt. No. 27

    Defendant Chevron Products Company's ("Chevron") motion to dismiss came on for hearing before this court on June 13, 2018. Plaintiffs Donald Potter and Phillip Novak appeared through their counsel, Don Birner. Defendant appeared through its counsel, Nathaniel Garrett, Christopher Lovrien, and Kapri Saunders. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

    Plaintiffs Donald Potter and Phillip Novak are individual citizens and residents of Illinois. Dkt. 24, FAC ¶¶ 3, 5–6. Chevron Products Company, a division of Chevron U.S.A., Inc., is a corporation existing under the laws of the State of Pennsylvania with its headquarters and principal place of business located at 6001 Bollinger Canyon Road, San Ramon, California. FAC ¶ 7. Chevron enters into agreements with oil-change stations branded as "Havoline Xpress Lube" stations (the "Operators") that grant them licenses to use and display Chevron and Havoline trademarks in connection with the retail sale of products manufactured by Chevron. FAC ¶¶ 42–43, 58, 72–77 & Ex. 2;

Mot. at 2. Havoline is a brand owned by Chevron.

Plaintiffs Donald Potter and Phillip Novak had their vehicles' oil and filters changed in Illinois at two Havoline Xpress Lube oil-change stations operated by Lyons Express Lube LLC and Grease Monkey Midwest, LLC, respectively. FAC ¶¶ 97, 99; Dkt. 24-6; Dkt. 24-7; Dkt. 28 ¶¶ 3–4 & Exs. A–B. Those stations had entered into agreements with Chevron such that they were effectively branded as Havoline Xpress Lube stations. E.g., FAC ¶¶ 98, 100; Dkt. 28, Exs. A–B. Potter alleges that he was presented with an invoice that included a $4.14 charge for hazardous-waste disposal. FAC ¶ 98. Novak alleges that he was presented with an invoice that included a $2.99 charge for "shop supplies." FAC ¶ 100. Plaintiffs allege that those $2.99 and $4.14 charges were inappropriate overcharges for their motor-oil changes.

Plaintiffs allege that defendant "failed to disclosed [sic] to consumers that the used oil was destined for recycling, not disposal, and that each HXL [Havoline] facility often profits by selling the used oil to its recyclers." FAC ¶ 23. Plaintiffs allege that the recycling or disposal fee was presented to customers on an invoice bearing Chevron's name and logo and gave the impression that the fee "is a pass through fee paid to governmental bodies when, in fact, no such fee exists[.]" FAC ¶¶ 33, 53, 79.

Plaintiffs allege that the "shop supplies" fee is "fictitious" because "[t]he consumer is intentionally not informed that shop supplies were not utilized or supplied by HXL facilities in connection with their oil changes" and "there are no shop supplies involved or consumed during the typical oil change, nor were any so called shop supplies provided to any of the class members at HXL Facilities." FAC ¶¶ 36–37.

Plaintiffs assert eight causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) unconscionability; (4) unjust enrichment; (5) negligence; (6) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"); (7) violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL"); and (8) violation of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1770 ("CLRA"), as actionable through the UCL.

They seek to represent a class of "[a]ll adult persons who were charged and paid a fee purportedly associated with recycling or disposing of used oil and/or for shop supplies, in connection with an oil change performed by Havoline Xpress Lube at any time within the United States."  FAC ¶ 105.  Plaintiffs estimate there are 500 Havoline Xpress Lube oil-change stations located across "most states."  FAC ¶ 84.

Plaintiffs seek to hold Chevron—rather than the individual Operators—liable for the recycling and shop fees in this action because Chevron allegedly retained "daily control over virtually every nuance of the oil change enterprise" through its contractual relationships with Operators such as Lyons and Grease Monkey.  FAC ¶ 58.  Plaintiffs attach a draft Sales Program Agreement that Chevron enters into with oil-change stations.  Dkt. 24-2.  Under that agreement, plaintiffs allege that Chevron grants a non-exclusive license to use and display Chevron and Havoline trademarks in connection with the retail sale of products manufactured by Chevron.  Id. § 2.  The agreement provides that the Customer (i.e., oil-change station) shall submit "all promotional materials and advertising . . . which bear any of Chevron's Identification to Chevron" for approval.  Id. § 13(c).  The agreement disclaims any ownership or franchise relationship, and recognizes that the Operator is "an independent business entity that is free to set its own selling prices and terms of sale, and generally conduct its business as it determines subject to the obligations" of the agreement.  Id. §§ 11, 27.

The Operator must purchase Chevron-branded motor oil (id. § 4), which the station takes title to when it is unloaded at the station (id. § 6), and it grants Chevron the right to inspect to determine whether the station is complying with various obligations (id. § 8).  Chevron is not granted any royalty based on the station's sales; rather the station pays Chevron only for the Chevron products it purchases.  Id. §§ 4–5.

Plaintiffs also attach a copy of the Standards of Appearance and Operations Guide.  Dkt. 24-3.  The guide describes certain standards intended to "enhance overall brand value."  Id. at 1.  The guidelines include aesthetics for interior décor, landscaping, and Havoline signage.  Id.  Plaintiffs allege that such control and branding led customers

3

1  to believe that Chevron owned and operated Havoline-branded oil-change stations.  E.g.,

2  FAC ¶¶ 58–60, 72–78, 98, 100, 122, 131.

3      Plaintiffs allege that, through those agreements, Chevron controlled the

4  advertising promoting the fees at issue.  E.g., FAC ¶¶ 40–47.  Plaintiffs also allege that

5  although Chevron's contracts facially gave deference to Operators with respect to fees,

6  "the actual substance and terms of the contract are tailored to afford Chevron complete

7  control and dominion" over the stores' operations and fees.  FAC ¶ 62.  Plaintiffs allege

8  Chevron orchestrated this central scheme out of its California headquarters to charge

9  phony add-on fees to increase the Operators' profits, who would then be better able to

10  purchase contractually-required Chevron products used in oil changes.  FAC ¶¶ 49, 58.

11      Plaintiffs filed their first complaint on November 20, 2017, asserting six causes of

12  action.  On January 26, 2018, Chevron moved to dismiss the original complaint.  Dkt. 21.

13  Plaintiffs did not oppose the motion, but instead filed the FAC on February 16, 2018.

14  Dkt. 24.  That amended complaint asserted the same six claims and added claims under

15  the FAL and CLRA.  On March 2, 2018, defendant filed the instant motion to dismiss the

16  FAC on the grounds that it fails to join necessary and indispensable parties under Rule

17  12(b)(7) and fails to state facts sufficient to constitute a cause of action against Chevron

18  under Rule 12(b)(6).  Dkt. 27.  Defendant also argues that plaintiffs lack standing to

19  maintain a nationwide class action under Rule 12(b)(1).

20                                          **DISCUSSION**

21  **A.    Legal Standards**

22      **1.    Motion to Dismiss Under Rule 12(b)(6)**

23      Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims

24  alleged in the complaint.  Ileto v. Glock, 349 F.3d 1191, 1199–1200 (9th Cir. 2003).

25  Under the pleading requirements of Federal Rule of Civil Procedure 8, which requires

26  that a complaint include a "short and plain statement of the claim showing that the

27  pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under

28  Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged

4

sufficient facts to support a cognizable legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

While the court must accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558–59 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

Review is generally limited to the contents of the complaint, although the court can also consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading."  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document").  The court may also consider matters that are properly the subject of judicial notice (Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001)), exhibits attached to the complaint (Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)), and documents referenced extensively in the complaint and documents that form the basis of the plaintiff's claims (No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2

### 2. Motion to Dismiss Under Rule 12(b)(7)

Federal Rule of Civil Procedure 19 "governs compulsory party joinder in federal district courts." E.E.O.C. v. Peabody W. Coal Co., 400 F.3d 774, 778 (9th Cir. 2005) ("Peabody I"). Federal Rule of Civil Procedure 12(b)(7) permits a party to move for dismissal for failure to join a party recognized as indispensable by Federal Rule of Civil Procedure 19. Fed. R. Civ. P. 12(b)(7); Quileute Indian Tribe v. Babbitt, 18 F.3d 1459, 1458 (9th Cir. 1994). When determining whether dismissal is appropriate under Rule 12(b)(7), the court undertakes "three successive inquiries." Peabody I, 400 F.3d at 779.

"First, the court must determine whether a nonparty should be joined under Rule 19(a)"—that is, whether a nonparty is "necessary." Id. A nonparty is "necessary" if joinder is "'desirable' in the interests of just adjudication." Id. (quoting Fed. R. Civ. P. 19 Advisory Committee Note (1966)). "There is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a). . . . The determination is heavily influenced by the facts and circumstances of each case." E.E.O.C. v. Peabody W. Coal Co., 610 F.3d 1070, 1081 (9th Cir. 2010) ("Peabody II") (quoting N. Alaska Envtl. Ctr. v. Hodel, 803 F.2d 466, 468 (9th Cir. 1986)).

A nonparty can be necessary under Rule 19(a)(1)(A) or Rule 19(a)(1)(B). A nonparty is necessary under Rule 19(a)(1)(A) if "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A). A nonparty is necessary under Rule 19(a)(1)(B) if that person "claims a legally protected interest in the subject of the suit such that a decision in its absence will (1) impair or impede its ability to protect that interest; or (2) expose [an existing party] to the risk of multiple or inconsistent obligations by reason of that interest." Dawavendewa v. Salt River Project Agr. Imp. & Power Dist., 276 F.3d 1150, 1155 (9th Cir. 2002).

Second, if a nonparty is necessary, the court determines "whether it is feasible to order that the absentee be joined." Peabody I, 400 F.3d at 779. Joinder is not feasible "when venue is improper, when the absentee is not subject to personal jurisdiction, and

when joinder would destroy subject matter jurisdiction." Id.

Third, if joinder is not feasible, the court must determine whether the party is "indispensable" under Rule 19(b), that is, whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). "The inquiry is a practical one and fact specific and is designed to avoid the harsh results of rigid application." Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (citations omitted). To make that determination, the court is to consider: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided . . .; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b); Peabody II, 610 F.3d at 1078 (an "indispensable party" is one who "not only has an interest in the controversy, but has an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience").

When considering a motion to dismiss under Rule 12(b)(7), the court accepts as true the allegations in the plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. Paiute-Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles, 637 F.3d 993, 996 n.1 (9th Cir. 2011). But the court may consider evidence outside of the pleadings. See McShan v. Sherrill, 283 F.2d 462, 464 (9th Cir. 1960). "The moving party has the burden of persuasion in arguing for dismissal" for failure to join. Makah Indian Tribe, 910 F.2d at 558; Sulit v. Slep-Tone Entm't, Case No. 06-cv-00045-MJJ, 2007 WL 4169762, at *1 (N.D. Cal. Nov. 20, 2007).

### 3. Motion to Dismiss Under Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss an action for lack of subject matter jurisdiction. A jurisdictional challenge may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). Where

the attack is facial, the court determines whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction, accepting all material allegations in the complaint as true and construing them in favor of the party asserting jurisdiction. See Warth v. Seldin, 422 U.S. 490, 501 (1975). Where the attack is factual, however, "the court need not presume the truthfulness of the plaintiff's allegations." Safe Air for Everyone, 373 F.3d at 1039. In resolving a factual dispute as to the existence of subject matter jurisdiction, a court may review extrinsic evidence beyond the complaint without converting a motion to dismiss into one for summary judgment. See id.; McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988) (holding that a court "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction").

**B.     Analysis**

Defendant moves to dismiss each of plaintiffs' causes of action for failure to state a claim under Rule 12(b)(6). The court first assesses whether plaintiffs have alleged sufficient facts to support a cognizable legal theory with respect to each of their claims.

**1.     Breach of Contract and the Covenant of Good Faith and Fair Dealing**

"To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." Richman v. Hartley, 224 Cal. App. 4th 1182, 1186 (2014); see also Judicial Council of California Civil Jury Instructions (2011), Instruction No. 303.

Defendant argues that the voluntary payment doctrine prevents plaintiffs from recovering for any breach of contract. Mot. at 12–13.

**a.     Whether the Complaint Identifies A Contract Between Plaintiffs and Chevron**

Defendant argues that plaintiffs do not identify any contract between them and Chevron at all, or the terms of any contract between plaintiffs and the Operators, and that

8

1   unsigned invoices are not sufficient to allege a contract. Mot. at 11–12. Plaintiffs allege

2   that the invoices reflect the terms of the agreement, but the parties entered into contracts

3   when plaintiffs reviewed advertising and then either orally or physically accepted the

4   advertised offer. FAC ¶¶ 125–26.

5       The contracts plaintiffs describe were offered through advertising or orally at the

6   stores and were accepted either orally or by handing an employee the keys to plaintiffs'

7   cars. E.g., FAC ¶¶ 126–30. Plaintiffs refer to invoices that they claim reflect "the terms of

8   the agreement," even if those invoices do not include all the terms of the agreement, and

9   even if the moment the invoices were presented to plaintiffs was not the moment of

10  contract formation. Opp. at 17. The court finds that plaintiffs sufficiently allege the

11  existence of contracts that they accepted orally or by transferring control of their vehicles.

12      The parties also dispute with whom those contracts were formed. Plaintiffs allege

13  that the Operators were Chevron's agents under an actual agency theory, an ostensible

14  agency theory, and a ratification theory of agency. Defendant disagrees.

15      "An agency is ostensible when the principal intentionally, or by want of ordinary

16  care, causes a third person to believe another to be his agent who is not really employed

17  by him." Associated Creditors' Agency v. Davis, 13 Cal. 3d 374, 399 (1975). "[T]here are

18  three requirements necessary before recovery may be had against a principal for the act

19  of an ostensible agent. The person dealing with the agent must do so with belief in the

20  agent's authority and this belief must be a reasonable one; such belief must be generated

21  by some act or neglect of the principal sought to be charged; and the third person in

22  relying on the agent's apparent authority must not be guilty of negligence." Associated

23  Creditors' Agency, 13 Cal. 3d at 399.

24      Defendant argues that oil companies are uniquely exempted from ostensible-

25  agency liability. It cites Apple v. Standard Oil, Div. of Am. Oil Co., 307 F. Supp. 107 (N.D.

26  Cal. 1969) for the proposition that oil companies cannot have an ostensible-agency

27  relationship with gasoline filling stations as a matter of law, because no reasonable

28  person could believe that oil companies own or operate the gasoline filling stations that

9

advertise a particular brand of gasoline.  The court is not persuaded that the line of cases defendant cites applies to this action.  The <u>Apple</u> case did not concern a dedicated oil-change or automotive-service station, which is at issue here, and much of the other case law defendant cites likewise concerns gasoline filling stations that in some instances also provided automotive-maintenance services.  That distinction is relevant to the extent those cases held that no person could reasonably believe that a gasoline filling station was the agent of the oil company it advertised.  It may or may not be the case that gasoline filling stations advertising the Chevron brand of gasoline are commonly known not to be agents of Chevron, but the court sees no reason why that knowledge would transfer to every other type of business that Chevron might be associated with—for example, dedicated oil-change stations.  Notably, Chevron's arguments would carve out a special exemption from standard ostensible-agency law for itself—but not for any competitor operating independently from an oil company, even if that competitor was running nearly-identical business operations using nearly-identical business methods.

Therefore, on Chevron's motion to dismiss, the court considers whether plaintiffs adequately alleged ostensible agency, without exempting Chevron from ostensible-agency liability as a matter of law.  Plaintiffs have alleged that they reasonably believed in the agent's authority, that their beliefs were generated by some act or neglect of the principal sought to be charged, and that they were not negligent in doing so.  <u>E.g.</u>, FAC ¶¶ 53–85, 122–23, 131.

Plaintiffs therefore adequately allege the formation of a contract with the Operators and that the Operators were ostensibly acting as agents of defendant.

### b.    Whether The Parties Performed, and Whether Plaintiffs Allege Harm

Plaintiffs allege that they paid their invoices, which constituted their performance.  FAC ¶¶ 98, 100, 128.

Defendant argues that plaintiffs do not allege how the invoice was breached.  Mot. at 12.  Plaintiffs' allegations and arguments concerning defendant's specific breach

are far from a model of clarity.  However, plaintiffs do allege that defendant never actually performed the services associated with the shop-supply and disposal fees that were identified and charged for on the invoices.  FAC ¶¶ 23, 36–37, 127, 131, 134.  Plaintiffs allege that they contracted and paid for shop supplies and waste disposal, but shop supplies were not in fact provided and the oil was in fact "recycled not disposed."  FAC ¶ 23, 36–37, 131.  As such, plaintiffs allege that defendant breached the contracts when it failed to perform those contracted-for services.

Similarly, plaintiffs allege harm in the form of money they paid for services that were not rendered.

### c.    Whether Plaintiffs' Claim Is Barred By the Affirmative Defense of Voluntary Payment

Defendant argues that the voluntary payment doctrine prevents plaintiffs from recovering under a breach of contract theory.  Mot. at 12–13.  Plaintiffs argue the doctrine does not apply because defendant hid facts and because the doctrine does not apply to consumer claims.  Opp. at 17–18.

"An affirmative defense may be considered [when considering a motion to dismiss] if the defense is based on undisputed facts or if the basis for the argument appears on the face of the complaint and any materials the court takes judicial notice of."  Ellsworth v. U.S. Bank, N.A., 908 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012); Scott v. Kuhlmann, 746 F.2d 1377, 1378 (9th Cir. 1984).

"The voluntary payment doctrine bars the recovery of money that was voluntarily paid with full knowledge of the facts."  Parino v. BidRack, Inc., 838 F. Supp. 900, 908 (N.D. Cal. 2011) (citing Am. Oil Serv. v. Hope Oil Co., 194 Cal. App. 2d 581, 586 (1961)).  "But it is elementary that an excessive payment made in ignorance of the fact that it is excessive is recoverable."  Am. Oil Serv., 194 Cal. App. 2d at 586.  Whether a plaintiff knew her payment to be excessive at the time of payment is "to be judged in light of the facts that were known to plaintiff [sic]" and not whether plaintiff has the "means of knowledge" by which they could have discovered the payment to be excessive.  Id. at

11

587; see also Rodman v. Safeway Inc., 125 F. Supp. 3d 922, 941 (N.D. Cal. 2015), aff'd, 694 F. App'x 612 (9th Cir. 2017). There is no affirmative defense unless plaintiffs "had such knowledge of the facts as would have rendered the payments voluntary." Am. Oil Serv., 194 Cal. App. 2d at 586.

Defendant's argument is based on the fact that plaintiffs did not know the charges were illegal under state law at the times they paid. But plaintiffs' claim is different. They claim that "the invoices claim shop supplies were provided or utilized when they were not" and that "the invoice [did not] disclose that the oil and filter were recycled not disposed." FAC ¶ 131. As such, plaintiffs argue that defendant described and charged for services that were never rendered, and plaintiffs mistakenly believed the fact that those services were rendered. Based on the pleadings, and considering the facts in the light most favorable to plaintiffs, the voluntary payment doctrine does not bar plaintiffs' complaint because they allege that they made payment without full knowledge of the facts.

For those reasons, the court finds that plaintiffs state plausible claims for breach of contract and the covenant of good faith and fair dealing.

### 2. Unconscionability

"Under California law . . . unconscionability is an affirmative defense, not a cause of action." Rubio v. Capital One Bank, 613 F.3d 1195, 1205 (9th Cir. 2010) (citations omitted); accord California Grocers Assn. v. Bank of Am., 22 Cal. App. 4th 205, 213 (1994) ("Unconscionability operates as a defense to enforcement of a contract of adhesion."); Chang v. Wachovia Mortg., FSB, Case No. 11-cv-01951-SC, 2011 WL 2940717, at *6 (N.D. Cal. July 21, 2011) ("California law is clear that unconscionability is not a cause of action, but rather a defense to the enforcement of a contract."). As it is not a cause of action, plaintiffs' claim for unconscionability is DISMISSED WITH PREJUDICE.

### 3. Unjust Enrichment

The court construes plaintiffs' unjust enrichment claim "as a quasi-contract claim seeking restitution" pled in the alternative to plaintiffs' breach of contract claim.

1   Rutherford Holdings, LLC v. Plaza Del Rey, 223 Cal. App. 4th 221, 231 (2014); Astiana v.

2   Hain Celestial Grp., Inc., 783 F.3d 753, 762 (9th Cir. 2015) (unjust enrichment claim was

3   "better read as raising a valid quasi-contract claim seeking the remedy of restitution"

4   because "in California, there is not a standalone cause of action for 'unjust enrichment,'

5   which is synonymous with 'restitution'"); Opp. at 18–19. A quasi-contract claim can

6   survive a motion to dismiss if plaintiff alleges that (1) the defendant enticed "plaintiffs to

7   purchase their products through 'false and misleading' labeling;" and that (2) the

8   defendant was "unjustly enriched" as a result. Astiana, 783 F.3d at 762.

9       Plaintiffs have met their burden, based on the same allegations that support their

10  breach of contract claim. As such, the court finds that plaintiffs state a plausible claim for

11  unjust enrichment.

12      **4.    Negligence**

13      Plaintiffs bring a cause of action for "negligence in business affairs" that they plead

14  "in the alternative to their breach of contract, breach of the covenant of good faith & fair

15  dealing claims, and unjust enrichment claims." FAC ¶ 160. In support, plaintiffs allege

16  that "Chevron approved" the Operators charging waste disposal and shop supply fees.

17  FACP ¶¶ 161, 166, 172–76. They allege that "Chevron had the right, opportunity[,] and

18  ability by virtue of its agreement with the operators of the facilities to prohibit charges" for

19  waste disposal and shop supplies charged by the Operators. FAC ¶¶ 162, 166, 172–76.

20  Plaintiffs allege that Chevron had a duty "running to third party oil change consumers" to

21  prevent the Operators from billing "customers for made-up charges." FAC ¶¶ 164, 172–

22  74. Plaintiffs allege that they "sustained damages in the amount of the payment for false

23  charges and should be reimbursed therefore." FAC ¶ 175.

24      Defendant argues that economic losses plaintiffs seek are recoverable only in a

25  cause of action sounding in contract. Mot. at 15. Plaintiffs argue that the economic loss

26  rule does not prohibit their claim. Opp. at 19–22.

27      The California Supreme Court has addressed how the economic loss rule interacts

28  with negligence causes of action:

13

1
2
3
4
5
6
7
8
9
10
11
12
13

> Economic loss consists of damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property. Simply stated, the economic loss rule provides: Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses. This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts. The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise. Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving one into the other. . . . We have also applied the economic loss rule to negligence actions. . . . Conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law.

14 Robinson Helicopter Co. v. Dana Corp., 34 Cal. 4th 979, 988–89, 999 (2004) (internal

15 quotation marks and citations omitted). The Court explained that negligence actions

16 require property damage because, if there is no property damage, "recourse in contract

17 law to enforce the benefit of the bargain is sufficient." Id. at 991 n.7 (internal quotation

18 marks omitted).

19 Here, plaintiffs' allegations supporting their negligence claims are wholly

20 repetitious of their breach of contract and alternative quasi-contract claims, and they only

21 claim harm "in the amount of the payment" for the shop supply and waste disposal fees.

22 FAC ¶ 175. Plaintiffs do not claim any "personal injury or damages to other property,"

23 and they allegedly suffered "purely economic loss due to disappointed expectations"

24 without alleging any "harm above and beyond a broken contractual promise." Robinson

25 Helicopter Co., 34 Cal. 4th at 988. The harm plaintiffs allege—contracting and paying for

26 a service that was not adequately provided, did not need to be provided, or was never

27 provided at all—is precisely the type of harm that the economic loss rule requires be

28 recovered through a cause of action sounding in contract rather than negligence.

1    However, an exception exists to this rule.  "Where a special relationship exists

2    between the parties, a plaintiff may recover for loss of expected economic advantage

3    through the negligent performance of a contract[.]"  J'Aire Corp. v. Gregory, 24 Cal. 3d

4    799, 804 (1979); see also Aas, 24 Cal. 4th at 643–45.  To determine the existence of a

5    "special relationship," the court balances six criteria:  "(1) the extent to which the

6    transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the

7    plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of

8    the connection between the defendant's conduct and the injury suffered, (5) the moral

9    blame attached to the defendant's conduct and (6) the policy of preventing future harm."

10    J'Aire Corp., 24 Cal. 3d at 804 (citing Biakanja v. Irving, 49 Cal. 2d 647, 650 (1958)).  In

11    connection with the last factor, "countervailing public policies" should also be considered.

12    Id. at 804 n.1.  When the J'Aire test is met, the defendant is deemed to have a "special

13    relationship" with the plaintiff and may be liable to the plaintiff in negligence for economic

14    damages.

15    The transactions at issue are Chevron's agreements with the Operators, which

16    allegedly resulted in Chevron permitting (or not preventing) the Operators from charging

17    unlawful fees for oil changes.  FAC ¶¶ 161–175.  At this stage, the court "[a]ssum[es] as

18    true for purposes of demurrer plaintiffs' allegations[.]"  Centinela Freeman Emergency

19    Med. Assocs. v. Health Net of California, Inc., 1 Cal. 5th 994, 1015 (2016).

20    First, the transaction was intended to affect the plaintiffs, or at least the class of

21    which the plaintiff is a member.  Centinela Freeman Emergency Med. Assocs., 1 Cal. 5th

22    at 1014 ("liability for negligent conduct may be imposed where there is a duty of care

23    owed by the defendant to the plaintiff *or to a class of which the plaintiff is a member*")

24    (internal quotation marks omitted).  Chevron and the Operators entered into contracts

25    that governed their relationships, and as plaintiffs recognize those agreements did not

26    directly bind "third party oil change consumers as a class."  FAC ¶ 164.  Nevertheless,

27    those agreements were intended to affect oil-change consumers.  They governed the

28    manner in which the Operators presented themselves to the public (branded as Havoline

Express Lube stations), the products that the Operators would carry and use when servicing oil-change customers, and other aspects of the Operators' interactions with consumers. E.g., FAC ¶¶ 16–19, 42–47, 53–54, 58–81.

Second, the court considers the foreseeability of harm to the plaintiffs. Plaintiffs argue that the improper charges themselves would obviously cause foreseeable harm to those that pay them. Opp. at 21. But the allegations supporting plaintiffs' negligence claim rests on Chevron's agreements with the Operators that did not prevent the alleged charges, as well as certain coordinated advertising messages. FAC ¶¶ 161–62, 172–74. Plaintiffs do not explain how Chevron should have foreseen that the operators would charge customers for itemized services on an invoice, but then surreptitiously not in fact provide those services. The same is true with respect to any advertisements originating with Chevron. The advertisement may advertise a price for a service, but it is unclear why Chevron should have foreseen that Operators would charge for add-on costs contemplated by the advertisements, but never in fact provide those add-on services.

Third, the court considers the degree of certainty that the plaintiff suffered injury. Plaintiffs allege that they paid for services that were never rendered but for which they were charged. Taking plaintiffs' allegations as true, it is reasonably certain that they suffered injury.

Fourth, the court considers the closeness of the connection between the defendant's conduct and the injury suffered. Here, the analysis is similar to the foreseeability of harm. Although plaintiffs allege that the Operators' conduct was impermissible, and Chevron failed to prevent that conduct, plaintiffs allege only a distant connection between Chevron's conduct and plaintiffs' injuries.

Fifth, the court considers the moral blame attached to the defendant's conduct. Although plaintiffs argue that the Operators acted in a blameworthy way, the facts supporting their negligence action—which was pled in the alternative to their contract action and assumed contracts did not exist with "non contracting oil change

consumers"[1]—do not support a finding that Chevron acted in a morally blameworthy way. While it allegedly failed to investigate and police the business practices of each of the Operators sufficiently to identify and prevent the Operators' over-charges, that failure would not constitute a moral failure on behalf of Chevron in this context.

Sixth, the court considers the policy of preventing future harm. Bringing claims against allegedly-offending Operators would likely help prevent similar future harms, at the very least harm caused by the specifically-identified Operators. It is possible that bringing this action against Chevron would have the effect of preventing some future harm by incentivizing Chevron to oversee and police the Operators' daily business operations. But any such effect would be uncertain. For example, Chevron could just as easily abandon their licensing enterprise entirely due to oversight costs, leaving the subsequently independent stations with even less oversight than exists today.

Overall, after balancing the criteria, the court finds that Chevron did not have a special relationship with plaintiffs such that it had a heightened duty to protect their interests. As such, the court finds that the economic loss rule precludes plaintiffs' negligence claim, and defendant's motion to dismiss plaintiffs' negligence claim is GRANTED WITH PREJUDICE.

### 5.   UCL, FAL, and CLRA Claims

Defendant moves to dismiss Counts 6–8 of the complaint, which allege violations of the UCL, FAL, and the CLRA. Defendant argues that these claims are governed by Illinois law rather than California law. Plaintiff argues that the court should wait for discovery to commence before determining which state's laws apply; but if the court reaches the question prior to discovery, it should find that California law applies.

The court must first decide whether to conduct a choice of law analysis with respect to those three causes of action now, at the pleading stage, or whether to conduct

---

[1] FAC ¶ 163; <u>see also</u> Opp. at 19 ("In this case, defendant claims that plaintiffs lack an enforceable contract. Hence, this negligence count is properly plead in the alternative[.]").

the analysis at some point in the future following further development of the factual record.  There is no bright-line requirement dictating when the court must determine which state's laws apply.

Although the seminal Ninth Circuit case concerning the choice of law analysis considered the issue at class certification (Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012)), courts regularly determine which state's laws apply on a motion to dismiss—particularly when assessing CLRA, UCL, and/or FAL claims asserted by plaintiffs who did not purchase products in California.  See, e.g., Frenzel v. AliphCom, 76 F. Supp. 3d 999, 1008–09 (N.D. Cal. 2014) (dismissing CLRA, UCL, and FAL claims on motion to dismiss because "each class member's consumer protection claim[s] should be governed by the consumer protection laws of the jurisdiction in which the transaction took place"); Frezza v. Google Inc., Case No. 12-cv-00237-RMW, 2013 WL 1736788, at *5–6 (N.D. Cal. Apr. 22, 2013) (dismissing UCL claim); Littlehale v. Hain Celestial Grp., Inc., Case No. 11-cv-06342-PJH, 2012 WL 5458400, at *1–2 (N.D. Cal. July 2, 2012) (dismissing UCL, FAL, and CLRA claims).  That is because "[t]here are cases in which further development of the factual record is not reasonably likely to materially impact the choice of law determination."  Frenzel, 76 F. Supp. 3d at 1007.

Further development of the factual record in this action is not reasonably likely to materially impact the choice of law determination.  This case concerns two residents of Illinois who are the named plaintiffs and a defendant headquartered in California.  Plaintiffs' CLRA, UCL, and FAL claims are indisputably based on two Illinois residents making purchases in two stores located in Illinois.

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law."  Mazza, 666 F.3d at 589 (quoting Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187 (9th Cir. 2001)).  The court applies California's governmental interest test to determine which state's law to apply.  That test requires a three-step analysis:

First, the court determines whether the relevant law of each of

18

the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

McCann v. Foster Wheeler LLC, 48 Cal. 4th 68, 87–88 (2010) (internal quotation marks and modifications omitted).

### a. Whether the Relevant California and Illinois Laws Are the Same or Different

There are three California consumer protection statutes at issue: the UCL, the CLRA, and the FAL.

The UCL has no scienter requirement (Lazebnik v. Apple, Inc., No. 5:13-CV-04145-EJD, 2014 WL 4275008, at *7 (N.D. Cal. Aug. 29, 2014)), whereas one must intend to induce reliance under Illinois law (Griffin v. Universal Cas. Co., 654 N.E.2d 694, 700–01 (Ill. App. Ct. 1995); Cocroft v. HSBC Bank USA, N.A., 796 F.3d 680, 687 (7th Cir. 2015)). This difference is material. Mazza, 666 F.3d at 591 ("In cases where a defendant acted without scienter, a scienter requirement will spell the difference between the success and failure of a claim."). Additionally, the UCL limits relief to injunctive relief and restitution, and it does not allow for damages or attorneys' fees. Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 179 (1999). Under Illinois law, actual damages and attorneys' fees may be available to the prevailing party. 815 Ill. Comp. Stat. Ann. 505/10a; see also Krautsack v. Anderson, 861 N.E.2d 633, 643 (Ill. 2006) (the statute "authorizes the court, in its discretion, to 'award actual economic damages or any other relief which the court deems proper'" including "an award of attorney fees and costs"). Again, this difference is material. Mazza, 666 F.3d at 591

(differing remedies are material); see also Littlehale, 2012 WL 5458400, at *2 ("Mazza found that differences in remedies can constitute material differences.").

Furthermore, liability for misrepresentation under the UCL, the CLRA, and the FAL each requires actual reliance. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 326 (2011) ("a plaintiff proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements") (internal quotation marks omitted); see also Buckland v. Threshold Enterprises, Ltd., 155 Cal. App. 4th 798, 811 (2007). Under Illinois law, a showing of actual reliance is not required. Cocroft, 796 F.3d at 687. Again, this difference is material. Mazza, 666 F.3d at 591 ("In cases where a plaintiff did not rely on an alleged misrepresentation, the reliance requirement will spell the difference between the success and failure of the claim.").

The CLRA[2] additionally requires pre-suit notice and an opportunity to cure. Cal. Civ. Code § 1782. Illinois law has no such requirement. This difference is material because it is an essential element or affirmative defense to the claim, and it can spell the difference between success and failure.

### b. Each Jurisdiction's Interest In the Application of Its Own Law

Second, the court examines each jurisdiction's interest in the application of its own law under the circumstances to determine whether a true conflict exists.

"[E]ach state has an interest in setting the appropriate level of liability for companies conducting business within its territory." Mazza, 666 F.3d at 592 (citing McCann, 48 Cal. 4th at 91). "In our federal system, states may permissibly differ on the extent to which they will tolerate a degree of lessened protection for consumers to create a more favorable business climate for the companies that the state seeks to attract to do business in the state." Id. Each state may strike the balance differently, and each has an

---

[2] Plaintiffs also allege that their CLRA allegations are actionable through the UCL, so to the extent they allege a UCL violation based on a CLRA violation, the UCL analysis is also relevant. FAC ¶ 198.

interest in enforcing its chosen balance. California law "acknowledges that 'a jurisdiction ordinarily has the 'predominant interest' in regulating conduct that occurs within its borders.'" Id. (quoting McCann, 48 Cal. 4th at 97).

This action alleges consumer protection statute violations based on Illinois residents viewing advertising and visiting shops in Illinois, and conducting business with those shops in Illinois. As Maza recognized, each jurisdiction has an interest in enforcing its consumer protection statutes.

> ### c. Which State's Interest Would Be More Impaired If Its Law Were Not Applied

Third, the court evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied. This factor "is not intended to 'weigh' the conflicting governmental interests in the sense of determining which conflicting law manifested the 'better' or the 'worthier' social policy on the specific issue. The test recognizes the importance of our most basic concepts of federalism, emphasizing the . . . appropriate scope of conflicting state policies, not evaluating their underlying wisdom." Mazza, 666 F.3d at 593 (internal quotation marks and citations omitted).

"California recognizes that 'with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest.'" Id. (quoting Hernandez v. Burger, 102 Cal. App. 3d 795, 802 (1980)). California considers the "place of the wrong" to be the state where the last event necessary to make the actor liable occurred. Id.

Here, as in Mazza, "the last events necessary for liability as to the foreign class members—communication of the advertisements to the claimants and their reliance thereon in purchasing vehicles—took place in the various foreign states, not in California. These foreign states have a strong interest in the application of their laws to transactions between their citizens and corporations doing business within their state." Id. at 594.

The only distinction  with <u>Mazza</u> that plaintiffs identify—that here the plaintiffs purchased oil change services rather than vehicles—is immaterial.

The last events necessary for liability—the communication of the marketing materials, the purchase of the services, the formation of the contracts, the servicing of the cars, the use of any shop supplies, and the undertaking of any oil disposal or recycling—all occurred in Illinois.  "Identifying these transactions as the events that trigger liability is consistent with other courts that have applied <u>Mazza</u>'s analysis." <u>Cover v. Windsor Surry Co.</u>, Case No. 14-cv-05262-WHO, 2016 WL 520991, at *8 (N.D. Cal. Feb. 10, 2016); <u>see also</u>, <u>Frezza</u>, 2013 WL 1736788, at *5–7 (holding that North Carolina law applied despite the fact that the defendant was headquartered in California and the alleged fraudulent representations originated in California because the transactions at the center of the dispute occurred in North Carolina); <u>Littlehale</u>, 2012 WL 5458400, at *1–2 (dismissing California fraud claim because transactions occurred in Pennsylvania).

<u>Mazza</u> also explained that "California's interest in applying its law to residents of foreign states is attenuated."  666 F.3d at 594.  In that case, the court declined to apply "California law to the claims of foreign residents concerning acts that took place in other states where cars were purchased or leased" even though the defendant was a California corporation and "one fifth of the proposed class members are located in California." <u>Id.</u> at 590, 594; <u>accord</u> <u>Frezza</u>, 2013 WL 1736788, at *5 ("As in <u>Mazza,</u> the defendant in this case . . . is headquartered in California, and the allegedly fraudulent representations originated from California[.]").

Therefore, the named plaintiffs' consumer protection claims are governed by the consumer protection laws of the jurisdiction in which the transactions took place, Illinois.  Plaintiffs' UCL, CLRA, and FAL claims are therefore DISMISSED WITH PREJUDICE.

**6.      Motion to Dismiss for Failure to Join Necessary Parties and for Lack of Subject Matter Jurisdiction**

Defendant argues that the action must be dismissed in its entirety due to plaintiffs' failure to join certain necessary parties under Rule 12(b)(7)—the Operators that actually

charged plaintiffs the fees at issue.  It also argues that plaintiffs' class action allegations should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction.  The court DENIES defendant's motion with respect to necessary joinder and subject matter jurisdiction WITHOUT PREJUDICE at this time.

There are issues in this action that require further factual development prior to their determination.  In particular, there are factual disputes with respect to the nature of the contracts at issue in this action and whether the particular Operators plaintiffs interacted with were acting as agents of Chevron.  Although plaintiffs alleged sufficient facts to overcome defendant's motion to dismiss with respect to those two issues, further development of the record is necessary to determine certain legal questions in this case, including whether others must be joined to this action pursuant to Federal Rule of Civil Procedure 19.

The court will hear motions for summary judgment on the issues that require further factual development prior to hearing a motion for class certification.

## CONCLUSION

For the reasons stated above, plaintiffs' claims for unconscionability, negligence, and violations of the UCL, FAL, and CLRA are DISMISSED WITH PREJUDICE. Defendant's motion to dismiss plaintiffs' claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment is DENIED.

**IT IS SO ORDERED.**

Dated:  August 24, 2018

_____
PHYLLIS J. HAMILTON
United States District Judge